UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.: 17-24103-Civ-COOKE/GOODMAN

TIKD SERVICES LLC,

    Plaintiff,

vs.

THE FLORIDA BAR, et al.,

    Defendants
_____/

**PLAINTIFF TIKD SERVICES, LLC'S RESPONSE TO
THE FLORIDA BAR DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

    Plaintiff TIKD Services, LLC (TIKD), hereby responds to the Motion for Summary Judgment [DE 189] filed by Defendants The Florida Bar and Michelle Suskauer and Joshua Doyle in their official capacities (collectively "The Florida Bar" or "the Bar," unless otherwise noted).

**I.    Introduction.**

    Discovery has confirmed and reinforced TIKD's core allegations: The Florida Bar, without any supervision by The Florida Supreme Court and in violation of its own rules, gave written and oral "advisory" opinions telling Florida lawyers that TIKD's business was illegal and that any lawyer who worked with TIKD or represented its customers would be subject to grievance proceedings for ethical violations. The Bar's conduct is a classic group boycott and concerted refusal to deal, a *per se* antitrust violation which nearly drove TIKD from the Florida market.

    The Florida Bar again insists it has "absolute immunity" to violate the federal Sherman Antitrust Act, but this contention was rejected more than 40 years ago in *Goldfarb v. The Virginia Bar* and recently reaffirmed in *Dental Examiners*, where the Bar participated on the losing side as *amicus curia*. Discovery has confirmed that The Florida Bar failed to correct its conduct after *Dental Examiners* and continues to engage in unilateral,

unsupervised anticompetitive conduct at the request of its members, in this case the dominant traffic ticket law firm in Florida, The Ticket Clinic.

Prior to discovery, TIKD was aware The Florida Bar had issued a mysterious, highly negative, Staff Opinion in August 2017 that seemed to be directed at TIKD. Discovery has revealed that not only was that Staff Opinion *specifically* about TIKD, but that the opinion was obtained surreptitiously by The Ticket Clinic, by asking another lawyer to submit a request under his name, who then handed it over to The Ticket Clinic to use to threaten any lawyer working with TIKD. Also, prior to discovery, TIKD was vaguely aware the Bar's Ethics Hotline was telling Florida lawyers "bad things" bout TIKD. Discovery has revealed that the Bar had developed a specific protocol for handling questions about TIKD, a virtual script that told Florida lawyers that TIKD was violating the law and that representing TIKD's customers would subject the lawyers to Bar discipline. Although the Bar continues to withhold documents and information based on a claim that what it tells lawyers is "privileged," there is ample summary judgment evidence to demonstrate the Bar's unsupervised, anticompetitive acts.

The Florida Bar wants to escape liability by claiming there is no evidence of an express agreement with The Ticket Clinic to exclude TIKD from the marketplace. There is *lots* of direct and circumstantial evidence. But TIKD does not have to prove a conspiracy between The Florida Bar and others to prove a Sherman Act violation; it is black-letter antitrust law that a professional association made up of competitors, including mandatory bar associations, are in themselves "combinations" that can illegally restrain trade.

As shown below, the summary judgment evidence demonstrates myriad issues of triable fact that preclude summary judgment. The Florida Bar, of all litigants, should not fear having its actions judged by a jury of peers. This Court should not grant summary judgment, but instead should proceed to trial as scheduled.

## II.   Legal Standard.

Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). "The moving party bears the initial burden to show the

district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id*. The nonmoving party must then show there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the nonmoving party." *Bush v. Houston County Commission*, 414 F. App'x 264, 266 (11th Cir. 2011). The Court may not undertake the jury's function of weighing conflicting evidence or determining the credibility of witnesses. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010).

Antitrust claims, in particular, are not well suited for dismissal on summary judgment because they frequently present complex issues of disputed fact. *See, e.g., Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700 (1969) (summary judgment reversed in antitrust lawsuit where discovery established questions of material fact); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464 (1962) (issues of material fact precluded summary judgment on claims that market participants conspired to restrain trade and exclude competitor from market, holding that where alleged conspirators deny the conspiracy, a jury should decide whom to believe).[1]

---

[1] *See also City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1998) (fact issues regarding defendants' collusive behavior precluded summary judgment of antitrust claims); *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991) (antitrust claim not subject to summary judgment where there was evidence of group boycott and where parties disagreed over the definition of the market); *DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989) (despite defendants' denial of a conspiracy, antitrust, tortious interference and other claims not subject to summary judgment where evidence sufficient to find conspiracy, especially given that "[c]onspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators."); *National Independent Theatre Exhibitors, Inc. v. Buena Vista Distribution Co.*, 748 F.2d 602 (11th Cir. 1984) (summary judgment improper where plaintiff presented evidence that competitor had threatened third parties with boycott to exclude plaintiff from the market); *Moecker v. Honeywell Intern., Inc.*, 144 F. Supp. 2d 1291 (M.D. Fla. 2001) (fact issues regarding whether competitor conspired with plaintiff's rival to monopolize market precluded summary judgment); *In re Androgel Litigation (No. II)*, 2018 WL 2984873 (N.D. Ga. June 14, 2018) (denying summary judgment on issues of antitrust conspiracy and anticompetitive effect where a reasonable jury could conclude that

> **III. The Florida Bar is not entitled to Eleventh Amendment immunity for the actions on which TIKD's claims are based.**

The Florida Bar repeats its argument, made in its motion to dismiss, that it is entitled to Eleventh Amendment immunity. TIKD likewise references and incorporates herein its response to that argument. *See* DE 31 at 3-5. The Bar continues to cite *Kaimowitz v. The Florida Bar*, 996 F.2d 1151 (11th Cir. 1993), still without acknowledging the later *en banc* ruling in *Manders v. Lee*, 338 F.3d 1304, 1390 (11th Cir. 2003) (en banc), which supplanted *Kaimowitz* and adopted a four-factor test for judging claims of qualified immunity. In particular, the Bar ignores the holding in *Manders* that 11th Amendment immunity turns on "the particular function at issue" on which the claim against the purported state agency is based, and the degree of state control over that function. 338 F.3d at 1309. The Bar has admitted the Florida Supreme Court played no role whatsoever in its investigation of TIKD or its issuance of ethics opinions condemning TIKD. Needelman 211:7-213:13. Under the now-applicable *Manders* test, the Florida Bar has no 11th Amendment immunity from TIKD's claims. DE 4-5.

Nor is TIKD's claim for injunctive relief under *Ex parte Young* "mooted" by the Bar's filing of a state court action. The Bar's unauthorized Staff Opinion remains published and in circulation. The Bar's Ethics Hotline presumably continues to tell Florida lawyers not to work with TIKD. The Bar has not corrected The Ticket Clinic's false statements to the media about the Bar's authority to issue injunctions and arrest violators. TIKD remains in need of the injunctive relief requested, which is specifically tailored to correct irreparable harm caused by The Florida Bar's actions and to prevent the Bar from usurping the role and power of the Florida Supreme Court. *See* DE 80 ¶ 113. *See Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 368 (7th Cir. 1990) ("Another factor supporting the injunction is that the AMA still vigorously maintains that its boycott activity was lawful, and has never acknowledged its past conduct's lawlessness.").

---

litigation settlements were reached to diminish competition and harm consumers); *Baker's Carpet Gallery, Inc. v. Mohawk Industries, Inc.*, 942 F. Supp. 1464 (N.D. Ga. 1996) (evidence of antitrust injury, coercion and conspiracy precluded summary judgment); *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 717 F. Supp. 1565 (N.D. Ga. 1989) (issues of material fact precluded summary judgment on antitrust claims).

> **IV.    The summary judgment evidence shows antitrust violations by the Florida Bar, standing alone, plus a combination in restraint of trade between it, The Ticket Clinic and others.**

The Florida Bar attacks TIKD's claims under Section 1 of the Sherman Act and its claim of conspiracy to monopolize under Section 2, arguing that TIKD cannot prove the "concerted action" element of the Sherman Act.  The Bar does not address TIKD's monopolization or attempted monopolization claims under Section 2 of the Sherman Act. *See American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) ("Section 1 applies only to concerted action that restrains trade.  Section 2, by contrast, covers both concerted and independent action, but only if that action monopolize[s] or threatens actual monopolization ….") (quotation marks and citations omitted).

The Bar's argument is premised on the fundamental misconception that its actions, regardless of their anticompetitive effect, must be tied to a "conspiracy" with The Ticket Clinic.  Not true.  As a professional association composed of competing members, the Bar's actions are "concerted" actions of its members, regardless of The Ticket Clinic's participation.  Further, even though TIKD need not prove concerted action between The Florida Bar and the Ticket Clinic, there is a wealth of direct and circumstantial evidence of such concerted action.

> **A.    Professional associations are subject to antitrust liability when they restrain competition for the benefit of their members.**

"The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace."[2]  To accomplish this ambitious purpose, Section 1 of the Sherman Act was drafted broadly:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.

Given the statute's purpose and breadth, trade and professional associations have long been subject to Sherman Act scrutiny because "the members of such associations often have economic incentives to restrain competition."  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988).

---

[2] ABA Model Jury Instructions in Antitrust Cases Instruction 1, Chapter 1 (2016).

By definition, these associations constitute "combinations" of competitors capable of restraining trade through their collective decision-making.  Thus, while Section 1 of the Sherman Act requires a "contract, combination ... or conspiracy" – that is, "concerted action," *Am. Needle, Inc.*, 560 U.S. at 190, – this "concerted action" element requires little analysis with respect to professional associations like the Florida Bar.  Instead, "associations are routinely treated as continuing conspiracies or 'combinations' of their members, as are bodies promulgating rules or standards for the competitive conduct of their members." Areeda & Hovenkamp, Antitrust Law, § 1477 at 311; *see also Allied Tube*, 486 U.S. at 500 (citing Areeda).

Federal courts have repeatedly held that professional associations, standing alone, violate the Sherman Act when their actions are in restraint of trade.  Illustrative cases include the following:

- In *American Society of Mech. Engineers, Inc. v. Hydrolevel Corp.*, the U.S. Supreme Court held that a professional association of mechanical engineers, which published advisory standards for industry products and devices, violated the Sherman Act by issuing an opinion that a device manufactured by a new entrant in the market was not safe. 456 U.S. 556, 571-73 (1982).  The association's opinion was requested by a competing company after an important customer of the company "decided to switch" to the new entrant.  *Id.* at 560.  The competing company used the association's opinion to "discourage customers from buying" the new entrant's product. *Id.* at 563.
- In *Goldfarb v. Virginia State Bar*, the U.S. Supreme Court held that a minimum fee schedule enforced by the Virginia Bar Association constituted "price fixing" in violation of the Sherman Act.  421 U.S. 773 (1975).  While the Virginia Bar argued that the fee schedule was "advisory," it had issued ethics opinions stating that members could be disciplined for charging less than the suggested fees.  *Id.* at 782-83.  Accordingly, the Court held that the schedule "was enforced through the prospective professional discipline from the State Bar, and the desire of attorneys to comply with announced professional norms." *Id.* at 781.
- In *Wilk v. American Medical Association*, the Seventh Circuit held that evidence supported a finding that a medical association violated the Sherman Act by declaring

**TIKD's Response to The Florida Bar Defendants' Motion for Summary Judgment – Page 6**

and advising its member physicians that it was "unethical for medical physicians to professionally associate with chiropractors." 895 F.2d 352, 356 (7th Cir. 1990). The court held the association's actions constituted an anticompetitive and illegal "boycott" aimed at eliminating chiropractors from the market by preventing them from cooperating with physicians. *Id.* at 357.

- In *North Carolina Board of Dental Examiners v. F.T C.*, the Fourth Circuit held that the North Carolina State Board of Dental Examiners, a state agency whose majority of members are licensed dentists, violated Section 1 of the Sherman Act by, among other actions, issuing letters claiming that non-dentists engaged in teeth-whitening services were illegally engaged in "the practice of dentistry," even though no court had so held. 717 F.3d 359, 365 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015).

- In *Teladoc, Inc. v. Texas Medical Board*, a federal district court enjoined the Texas Medical Board, the state agency responsible for regulating the practice of medicine and controlled by licensed physicians, from implementing a regulation restricting innovative telemedicine by mandating a "face-to-face visit … before a physician can issue a prescription." 112 F. Supp. 3d 529, 534 (W.D. Tex. 2015).

Further, certain kinds of conduct by professional associations, including concerted refusals to deal such as TIKD faces here, are inherently suspect and therefore subject to a *per se* antitrust analysis. *E.g., F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422, 436 (1990) (no proof of market or market power required "to warrant condemnation under the antitrust laws" of attorneys' "concerted refusal to serve an important customer in the market for legal services"). "Group boycotts, or concerted refusals [to deal], have long been held to be in the forbidden category." *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959).

The Florida Bar's concerted refusal to deal, which it accomplished by issuing oral and written opinions that attorneys working with TIKD would violate Bar ethical rules, is a textbook example of a *per se* antitrust violation. *See In the Matter of the N. Carolina Bd. of Dental Examiners*, 152 F.T.C. 640, 2011 WL 11798463, at *21, *24 ("The challenged conduct is, at its core, concerted action excluding a lower-cost and popular group of competitors. … As such, the Board's conduct bears a close resemblance to conduct that the Supreme Court has condemned as per se illegal and that the Court continues to treat as

conclusively anticompetitive under *Northwest Wholesale Stationers*.)*; see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) ("Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'").

Tellingly, The Florida Bar does not deny that TIKD alleges *per se* antitrust violations. Instead, the Bar rests on the mistaken premise that, even if it engaged in conduct that the Supreme Court has condemned as *per se* illegal, it escapes liability because there was "no conspiracy" with the Ticket Clinic." Motion at 5.

### B. The Florida Bar itself is a continuing combination or conspiracy under Section 1 of the Sherman Act.

The Florida Bar claims there is "no evidence" that it entered into "an antitrust conspiracy" with The Ticket Clinic. Motion at 6. There is ample summary judgment evidence showing it did. *See* Section IV.C, below. However, TIKD need not show concerted action between The Florida Bar and The Ticket Clinic. The Florida Bar alone, as a professional association, meets the "combination or conspiracy" element of Section 1. Because The Florida Bar is a mandatory membership professional trade association composed of members with economic incentives to restrain trade, the Bar is treated as a "continuing" combination or conspiracy of its members under the Sherman Act. *Allied Tube & Conduit Corp.*, 486 U.S. at 500 (citing Areeda). "When an organization is controlled by a group of competitors, it is considered to be a conspiracy of its members." *N. Texas Specialty Physicians v. FTC.*, 528 F.3d 346, 356 (5th Cir. 2008).

Indeed, this tenet of antitrust law is highlighted in the first case cited by the Bar, *American Needle*, where the U.S. Supreme Court, in a unanimous opinion, held that activities of a corporate entity formed to manage the National Football League's intellectual property constituted "concerted action" under the Sherman Act. 560 U.S. at 201. Describing the "long held" doctrine "that concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities," the Court pointed out that it has "looked past the form of a legally 'single entity' when competitors were part of professional organizations or trade groups." *Id.* at 192.

The Florida Bar also ignores the *seven* U.S. Supreme Court cases on which *American Needle* relied. 560 U.S. at 192 n. 3-4 (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986); *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332 (1982); *National Soc. of Professional Engineers v. United States*, 435 U.S. 679 (1978); *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656 (1961) (per curiam); *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457 (1941)).

A professional association's actions are treated as the concerted action of its members because they are "attributed to its members as a continuing conspiracy." Areeda & Hovenkamp, Antitrust Law, § 1477, at 312. This is black-letter law, as reflected in the ABA model jury instruction helpfully entitled "Trade Organization May Commit Antitrust Violations:"

> An association is capable of committing violation of the antitrust laws. … These actions constitute an agreement with its members in violation of the Sherman Act even if the association has not conspired with a nonmember.

ABA Model Jury Instructions in Civil Antitrust Cases, Section 1, Instruction 10 (2016).

This is why, in *Professional Engineers*, 435 U.S. 679, "the court never asked whether the society as an entity had conspired with anyone [in promulgating ethical canons]; it saw the issue, obviously and correctly, as whether 'an agreement among competitors' (*i.e.*, the engineer members) restrained competition unjustifiably." Areeda & Hovenkamp, Antitrust Law § 1477, at 313. It is why, in *American Society of Mech. Engineers*, 456 U.S. 556, the professional association's antitrust violation was based on its "members' conspiracy to promulgate and administer industry standards," not on a possible conspiracy between the association and the member who requested the issuance of a standard for the purpose of targeting a competitor. *Id.* at 313-24. And it is why, in *Goldfarb*, 421 U.S. 773, the Virginia Bar's endorsement of minimum fee schedules "was treated as a conspiracy among the members." *Id.* at 315.[3]

---

[3] *See also California Dental Ass'n v. F.T.C.*, 128 F.3d 720, 728–29 (9th Cir. 1997), vacated and remanded on other grounds, 526 U.S. 756 (1999) ("CDA members are independent, profit-seeking dentists in competition with each other. By joining the CDA, they effectively agree to abide by the CDA's Code of Ethics. CDA's advertising policies and accompanying enforcement activities thus constitute a combination or agreement within the meaning of Section 1 of the Sherman Act.").

The Florida Bar's contention that it is not subject to Section 1 liability because its anticompetitive acts were the acts of a "single entity" was rejected long ago. The ten pages The Florida Bar devotes to distancing itself from The Ticket Clinic, therefore, are pointless. Even if there were not ample evidence of collusion and coordination between the Bar and The Ticket Clinic, the Bar would still be subject to Section 1 liability for its own anticompetitive acts. TIKD has met its burden of showing The Florida Bar's concerted action through the simple facts that (i) Florida lawyers must be Bar members to practice law and must abide by the Florida Rules of Professional Responsibility and (ii) with no active supervision by the Florida Supreme Court, the Florida Bar issued a written ethics opinion effectively barring Florida lawyers from working with TIKD or representing TIKD's customers and gave oral ethics opinions to numerous Bar members advising them not to work with TIKD or represent its customers. *See* Section IV.C, below.

Just like in *Professional Engineers*, *American Society of Mech. Engineers*, and *Goldfarb*, it does not matter for purposes of showing Sherman Act "concerted action" whether the Bar gave these ethics opinions in coordination with The Ticket Clinic (although, as shown below, there is substantial evidence that it did). What matters is that the Bar's acts as a professional association are a continuing combination or conspiracy, just as they were in connection with the cease-and-desist letters in *Dental Examiners*, ethical canons in *Professional Engineers*, the advisory opinion in *American Society of Mech. Engineers*, and the Virginia Bar ethics opinions in *Goldfarb*, all of which were held to violate the Sherman Act.

Imposing antitrust liability on the organization "is most faithful to the congressional intent that the private right of action deter antitrust violations." *American Society of Mech. Engineers*, 456 U.S. at 572-73. However, the fact that professional associations are subject to potential liability for their actions does not automatically render those actions illegal under the Sherman Act. A professional association is not "trapped by antitrust law," because, for most types of conduct, an association's actions are not anticompetitive or, even if they are, may be evaluated under the more lenient Rule of Reason. *American Needle*, 560 U.S. at 202. The Bar does not argue that its actions here were not anticompetitive, nor that they should be reviewed under or satisfy, as a matter of law, the Rule of Reason; at trial it will have an opportunity to show that its acts were not "in restraint of trade." For purposes of summary

**TIKD's Response to The Florida Bar Defendants' Motion for Summary Judgment – Page 10**

judgment, however, "the conduct at issue … is still concerted activity under the Sherman Act that is subject to § 1 analysis." *Id*.

### C. The Florida Bar, The Ticket Clinic, and other attorneys engaged in a combination in restraint of trade.

Even if it were required, and it is not, there is ample summary judgment evidence, construed in the light most favorable to TIKD, that The Florida Bar engaged in concerted action with The Ticket Clinic and other lawyers to exclude TIKD from the market.

To prove concerted action under Section 1 of the Sherman Act, a plaintiff may rely on direct evidence, circumstantial evidence, or both. *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1294 (M.D. Fla. 2016). A plaintiff "need not prove an intent on the part of the co-conspirators to restrain trade or to build a monopoly. So long as the purported conspiracy has an anticompetitive effect, the plaintiff has made out a case under section 1." *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 819–20 (11th Cir. 1990). Only if the plaintiff is relying solely on circumstantial evidence of concerted action must he or she "adduce evidence that tends to exclude the possibility that the alleged co-conspirators acted independently and in a manner consistent with rational business objectives." *Id*.

"Conspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." *DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989) (antitrust claims not subject to summary judgment, despite defendants' self-serving denials of a conspiracy); *Moecker v. Honeywell Intern., Inc.*, 144 F. Supp. 2d 1291 (M.D. Fla. 2001) (fact issues regarding whether competitor conspired with plaintiff's rival to monopolize market precluded summary judgment, because only rarely will plaintiff have evidence of an express agreement) (citing *DeLong*).

The Ticket Clinic and other ticket defense lawyers are under financial pressure because "of all the competitors." Kowitt 149:13-14. The "pie is shrinking" and it "costs a lot" "to get the phones to ring" at The Ticket Clinic. Kowitt 132:2-7; Ex. 6. The Ticket Clinic sees TIKD as competition. TC SOF ¶ 22. The Ticket Clinic and other ticket lawyers expect the Bar to "protect guys like" them because they spent three years in law school. Ex. 6. Ted Hollander, of The Ticket Clinic, understood that the Bar was "on our side." *Id*.

The summary judgment evidence shows, despite the Bar's equivocations, that its investigation of TIKD was generated by a complaint from Mark Gold, owner of The Ticket Clinic. Ex. 1. The Bar responded immediately with a promise to help "right away and notify UPL." Ex. 1. Hollander soon jumped in with his own complaint to the Bar about TIKD. Ex. 2-D. Gold and Hollander were in almost constant communication with the Bar about TIKD, pressuring the Bar to take action. *See* Exs. 2-D, 9, 10, 11, 12, 13, 14, 15, 16, 17, 17, 18, 19, 20, 21, 22, 30. When TIKD announced it was expanding into new counties, Hollander immediately pressured the Bar to take action. Ex. 9.

On April 8, 2017, Gold sought a written ethics opinion from the Bar, with the transparently false claim that he was considering working with TIKD, which he had sued the day before, claiming its business was illegal, and which he called "a scam, plain and simple," a "scam upon a scam," and a "total fraud." Ex. 21; RE 80 ¶ 53; Exs. 10, 16, 17. While pretending to "deny" Gold's request, the Bar provided him a detailed letter effectively opining that TIKD was engaged in UPL and that any lawyer working with TIKD would violate the Bar's ethics rules. Ex. 22.

The Ticket Clinic next leveraged The Florida Bar's Ethics Hotline. While bound by the same rules governing written ethics opinions, the Bar cannot ensure its hotline complies with those rules, because it grants callers anonymity. Quintiliani 146:24-147:10; 153:6-156:23; 157:17; 158:9. The Bar's Ethics Counsel admitted "[i]t would be improper" to tell lawyers "not to do business with TIKD" and that "Staff counsel should not be telling them" that, *id*. 167:-11-22; 168:4-5, but that is *exactly* what the Bar did.

The Florida Bar defined a specific protocol for answering hotline questions about TIKD that effectively told Florida lawyers not to do business with them. The Bar told lawyers TIKD "may be engaging in UPL," that "[i]t looks like there is fee splitting," and TIKD was providing "financial assistance to a client that the lawyer cannot participate in." Ex. 23. The Bar now grudgingly admits a lawyer told these things by the Bar "might" decline to do business with TIKD. Tarbert 76:14-25. The Bar knew the Florida Supreme Court had made none of these determinations. *Id*. 69:24-70:3.

The Ticket Clinic and The Florida Bar clearly coordinated how to handle calls from lawyers asking about TIKD. Its UPL counsel got tired of answering calls, and told The Ticket Clinic to tell lawyers to call the Hotline. TFB SOF ¶¶ 39-42. The Ticket Clinic

**TIKD's Response to The Florida Bar Defendants' Motion for Summary Judgment – Page 12**

happily complied, knowing the Bar would tell callers not to do business with TIKD.  Exs. 24, 25; Ex. 3-B.  Many did, and quit working with TIKD because of what the Bar told them.  Exs. 3, 4, 5.

Not content with oral Hotline opinions, Gold and Hollander schemed to have a non-Ticket Clinic Lawyer, Barry Kowitt, copy Gold's earlier opinion request onto his letterhead and submit it to the Bar.  Kowitt 57:24-58:10.  Hollander knew Kowitt had no intent to work with "those D-bags." *See* Ex. 8.  While this sham opinion request was pending, Hollander told the *Miami Herald* "I am confident that the bar will take the necessary steps to end this service."  Ex. 2-L.

Less than a week later, the Bar issued a written Staff Opinion, copied *verbatim* from its earlier "denial" of Gold's opinion request.  Compare Ex. 22 with Ex. 2-F.  The opinion admitted that "whether it is lawful for the company to provide the services as described as a legal question, beyond the scope of an ethics opinion," but it nonetheless stated that "it appears" participating in TIKD's program "raises ethical concerns" over fee splitting, solicitation, indirect attorney client relationships, *and the unlicensed practice of law* and financial assistance to clients."  Ex. 2-F (emphasis added).  Again, the Bar acted with no supervision or approval by the Florida Supreme Court.

As planned, Kowitt forwarded the Staff Opinion to Hollander, who (after deleting Kowitt's name) distributed it to multiple ticket lawyers, demanding further distribution, Ex. 28, and even sent it to the Bar's UPL lawyer for good measure.  Ex. 27.

Given these facts, TIKD hardly needs to rely on circumstantial evidence to prove concerted action between The Florida Bar and The Ticket Clinic.

The Bar spends two pages discussing the contacts that three lawyers – Jeremy Simon, Julia McKee and Christopher White – had with Needelman regarding doing work for TIKD.  Motion at 9-12.  The Bar suggests the sworn testimony in their declarations, *see* Exs. 3, 4, 5, respectively, is "contradicted" by other evidence.  *See* Motion at 10-11 ("This flatly contradicts [Simon];" "the record evidence contradicts [McKee's] allegations," etc.).  These assertions hardly support granting summary judgment.

First, the existence of conflicting evidence is a reason to *deny* summary judgment, not grant it.  Summary judgment is not the place to weigh conflicting evidence and chose a side.  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) ("Neither we nor the

district court are to undertake credibility determinations or weigh the evidence [on summary judgment].")

Second, while the Bar suggests White and McKee stopped working for TIKD for reasons other than the Bar-supported threats and harassment they received, and points out that Simon has so far withstood those threats, this is no basis for granting summary dismissal. Even if there is evidence that the conspiracy to drive TIKD lawyers from the market was less than 100% successful, that does not excuse the Bar from liability for the damages it wrought.

Finally, focusing on Needelman's denials is a red herring when the Bar has admitted that its Ethics Hotline lawyers were telling lawyers not to work with TIKD and its Staff Opinion, broadly distributed by The Ticket Clinic, conveyed the same message in writing.

The Bar also insists that Kowitt's request was "patently" valid and the Bar's issuance of the Staff Opinion was "authorized" under Bar Rules. *Id.* But this argument erroneously conflates the question of whether there was concerted action with the question of whether there was an unreasonable restraint of trade, and is wrong. "Whether an 'agreement' exists for purposes of section 1 is separate from the question of whether an agreement, if found to exist, constitutes an unreasonable restraint of trade." *Procaps S.A. v. Patheon Inc.*, 36 F. Supp. 3d 1306, 1318 (S.D. Fla. 2014) (citing *American Needle*, 560 U.S. at 186). Even when an association is "authorized" to issue opinions, it may still face antitrust liability. *E.g.*, *American Society of Mech. Engineers, Inc.*, 456 U.S. at 571-73; *Goldfarb*, 421 U.S. at 781-83. While the Bar is free to argue to the jury that telling Florida lawyers not to work with TIKD was a reasonable restraint of trade, it has not made that argument in its summary judgment motion.

Kowitt's request was not, in fact, "valid," nor was the Bar's Staff Opinion "authorized." Lawyers may only request ethics opinions about their "own contemplated prospective conduct." Florida Bar Procedures for Ruling on Questions of Ethics Bar Rule § 2(a) 2-9.4(d). Kowitt did not intend to work with TIKD; he re-submitted Gold's ethics opinion request because Hollander asked him to; no one would believe Gold and Hollander intended to work with TIKD. In short, Kowitt submitted a sham ethics opinion request on The Ticket Clinic's behalf, in order to obtain ammunition to use against TIKD and its cooperating lawyers.

**TIKD's Response to The Florida Bar Defendants' Motion for Summary Judgment – Page 14**

Moreover, the Bar cannot issue ethics opinions on matters that are the subject of active UPL or ethics investigations. Florida Bar Procedures for Ruling on Questions of Ethics § 2(a)(1)(F). The Bar had begun investigations in to TIKD and attorneys working with TIKD months before Kowitt's request. Ex. 2 ¶¶ 6-7, 10; Ex. 2-A. In discovery, the Bar admitted it would be improper to tell lawyers not to work with TIKD. Quintiliani 167:-11-22; 168:4-5. But that is what it did, both in its Staff Opinion and through its Hotline, at The Ticket Clinic's behest.

The Bar also ignored and violated clear rules governing the issuance of UPL opinions, which for good reason are strictly limited, given that their impact extends beyond members of the Florida Bar. *See* Bar Rule 10-9. The Bar is not permitted to issue UPL opinions without following strict procedural rules, including public notice and a public hearing, none of which the Bar followed before telling Hotline callers TIKD "may be engaging in UPL" and issuing a written Staff Opinion stating that "it appears" TIKD is engaged in "the unauthorized practice of law." Ex. 23; Ex. 2-F.

The evidence is palpable: Gold and Hollander of The Ticket Clinic recruited another ticket lawyer, Kowitt, to submit a sham ethics opinion request to The Florida Bar, which obligingly issued a Staff Opinion declaring TIKD's business to be illegal – in violation of its own rules and without the slightest supervision or approval by the Florida Supreme Court.

**V.     The Florida Bar has no immunity "as an arm" of the Florida Supreme Court.**

Either abandoning or renaming its claim of *Parker* state action immunity in the face of the Department of Justice's filing supporting TIKD, DE 115, the Bar makes a vague, one-paragraph claim of "absolute immunity." Motion at 16-17. The Bar does not cite a single case holding that a bar association has such "absolute immunity" from antitrust liability. *Id*. If state bar "absolute immunity" from antitrust laws was ever the law, it ended 43 years ago in *Goldfarb v. Virginia State Bar*, when the Supreme Court held that "[t]he fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members." 421 U.S. 773, 791 (1975).

In the only case the Bar cites that even includes antitrust claims, the court resolved those claims based on *Parker* immunity, not "absolute immunity." *See Rosenberg v. Florida*, 15-22113-CIV, 2015 WL 13653967, at *7 (S.D. Fla. Oct. 14, 2015). As TIKD has

previously explained, the *Rosenberg* court's *Parker* immunity analysis does not apply here. DE 126.[4] The "absolute immunity" the Bar seeks to clothe itself with has not been applied to protect it from violations of the Sherman Act acting outside its "disciplinary functions." *Kivisto v. Soifer*, 0:10-CV-61758-UU, 2011 WL 13186683, at *6 (S.D. Fla. Mar. 14, 2011) (relying on outdated *Kaimowitz* to dismiss civil rights claims); *Tindall v. The Florida Bar*, 97-387-CIV-T-17C, 1997 WL 689636, at *4 (M.D. Fla. Oct. 14, 1997).

TIKD is not challenging actions taken or actively supervised by the Florida Supreme Court, nor discipline imposed by the Bar on a licensed Florida attorney. Rather, TIKD challenges the Bar's unilateral, unsupervised and unauthorized anticompetitive actions that stifled The Ticket Clinic's competition.

## VI.   The Bar's antitrust violations are not protected under *Noerr-Pennington*.

The Bar repeats the argument, made in its motion to dismiss, that its purported "right to express opinions about TIKD's conduct" is protected by *Noerr-Pennington*. Motion at 17. TIKD has previously responded to this argument in detail. DE 31 at 11-12. In short, *Noerr-Pennington* still does not apply.

*Noerr-Pennington* applies to "[j]oint efforts to influence public officials," *United Mine Worker of Am. v. Pennington*, 381 U.S. 657, 670 (1965), and the Bar's anticompetitive acts were not directed towards influencing public officials, but rather the members of its association, *i.e.*, lawyers in private practice who might associate with TIKD. If *Noerr-Pennington* applied here, the Supreme Court's decisions in *Dental Examiners*, *etc.*, were all incorrect.

TIKD's lawsuit is not based on the Bar's state-court UPL lawsuit, contrary to its contention. This lawsuit was filed *before* the Bar filed its UPL suit, and is based on the Bar's unsupervised and unauthorized actions taken during the course of its investigation: falsely

---

[4] The plaintiff in *Rosenberg* was a licensed Florida attorney suspended by the Florida Supreme Court. 2015 WL 13653967, *1-2. The Supreme Court denied Rosenberg's motions for rehearing, and he did not seek review by the U.S. Supreme Court. *Id.* at *2. Instead, he filed a twenty-five-count federal lawsuit against the State of Florida, the Florida Supreme Court, and the Florida Bar. *Id.* The district court found it "impossible to discern what specific facts" Rosenberg alleged to support his claim against the Florida Bar, *id.* at *7, probably because his lawsuit attacked the Florida Supreme Court's suspension order and the constitutionality of state law, not actions taken by the Florida Bar. *Id.* at *2. In any case, the district court dismissed the antitrust claims under *Hoover v. Ronwin*, 466 U.S. 558 (1984), noting that "The Florida Bar is an arm of the State *in its capacity as a regulator of licensed attorneys in Florida.*" 2015 WL 13653967, *7 (emphasis added).

telling lawyers it had determined TIKD violated the law, issuing unauthorized oral and written opinions to that effect, and facilitating a competitor's smear campaign against TIKD with those opinions.  Virtually identical conduct was held to fall outside of *Noerr-Pennington* by the Seventh Circuit in *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 358 (7th Cir. 1990), which held that anticompetitive communications by the American Medical Association targeting chiropractors "were not aimed at obtaining legislative action," but "were instead aimed at medical physicians and hospitals, cautioning them that it was unethical ... to associate professionally with chiropractors."  The same is true here.  The Bar's unauthorized opinions were not "efforts to influence public officials," but rather communications to its members, private individuals.

      The Bar remains free to do the two things it has authority do to:  investigate and file suit.  TIKD's antitrust claims do not seek to restrict this limited authority.  The Bar has no authority, however, to tell attorneys via ethics "opinions" that TIKD violates UPL rules, especially when it is simultaneously engaged in a purportedly neutral investigation.

      The Bar cites the same cases it relied on in its Motion to Dismiss, and they still do not apply.[5]  The Bar's unsupervised opinions were neither "intimately related" to the Bar's UPL lawsuit nor were they "pre-litigation" communications.  *Cf. Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006) (pre-suit demand letters threatening legal action were protected); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1559 (11th Cir. 1992) (same with respect to pre-suit litigation threats).  Indeed, the Bar Rules *prohibit* giving opinions when the matter is subject to a pending UPL investigation or ethics complaint.  *See* Ethics Rule 2(a)(1)(F); Bar Rule 10-6(a) (Conduct of Proceedings).  The Bar's actions, therefore, could not be further from those protected by *Noerr-Pennington*.

**VII.    The Florida Bar exercises complete market power over legal services in Florida.**

      The Florida Bar unquestionably holds market power over legal services in Florida.  As explained by Dr. Abrantes-Metz:

> The Florida Bar has the plenary ability to control the Relevant Market because its membership encompasses 100% of licensed attorneys in the State of Florida—

---

[5] The Florida Bar also cites an unpublished order issued by a Washington federal court in *Ferguson v. Waid*, No. 2:17-cv-01685-RSM (W.D. Wash).  This order is irrelevant, because the Washington bar was not a defendant, and the case did not involve any conduct by that bar.  Indeed, it did not even involve an antitrust claim.

**TIKD's Response to The Florida Bar Defendants' Motion for Summary Judgment – Page 17**

      including 100% of licensed attorneys specializing in defending traffic tickets—and because, through its licensing, investigatory, regulatory, and disciplinary functions, including issuing ethics opinions and responding to questions from attorneys calling its Ethics Hotline, it serves as the absolute gatekeeper empowered to bar access to attorneys who wish to serve that market.  Through its regulations and disciplinary measures with an effect of excluding providers of access to legal services from the Relevant Market, The Florida Bar has the power to place barriers to entry into and to influence market outcomes in the Relevant Market.   Report at 5.

      The Florida Bar's market power is no different from the Dental Board's market power in *Dental Examiners*.  "[T]he Board had market power in the relevant market, as demonstrated by its ability to exclude non-dentist providers from the relevant market." 152 F.T.C. 640, 2011 WL 11798463, at *8 (2011).

      The Bar nonetheless has insisted that, with respect to TIKD's claims under Section 2 of the Sherman Act, it "cannot monopolize or attempt to monopolize" the market for providing access to legal services to defend traffic tickets because it, as an independent entity, "does not engage in the practice of law."  DE 17 at 17.  The Bar repeats this argument (word-for-word) in its motion for summary judgment.  Motion at 18.

      TIKD has already rebutted this flawed argument.  *See* DE 31 at 13-14.  The Bar still cites no authority supporting its position that a bar association is protected from Section 2 liability simply because the association, as an entity, does not engage in the practice of law.  In fact, the U.S. Supreme Court has held the opposite time and time again with respect to various professional associations.  *See American Society of Mech. Engineers*, 456 U.S. 556 (affirming Section 2 liability on association that did not compete directly in its membership's market); *Silver v. New York Stock Exch.*, 373 U.S. 341 (1963) (same); *Associated Press v. U.S.*, 326 U.S. 1 (1945) (same).

      Indeed, The Florida Bar's argument directly contradicts the U.S. Supreme Court's holding that, to deter antitrust violations, an association should be held directly liable for anticompetitive acts carried out by the association.  Imposing antitrust liability on the "organization – which is best situated to prevent antitrust violations through the abuse of its reputation – is most faithful to the congressional intent that the private right of action deter antitrust violations."  *American Society of Mech. Engineers*, 456 U.S. at 572-73.

## VIII. Conclusion.

As shown above, and in response to The Ticket Clinic Defendants' motion for summary judgment, the evidence shows multiple triable issues of fact precluding dismissal of TIKD's claims against The Florida Bar as a matter of law. The Court should deny the Florida Bar's motion and proceed to trial.

Respectfully submitted,

*/s/ Robert J. Kuntz, Jr.*
Robert J. Kuntz, Jr.
Florida Bar No. 094668
rkuntz@devinegoodman.com
Devine Goodman Rasco &
Watts-Fitzgerald, LLP
2800 Ponce De Leon Blvd., Suite 1400
Coral Gables, FL 33134
Telephone: 305/374-8200
30/374-8208 (fax)

*/s/ Peter D. Kennedy*
Peter D. Kennedy (admitted *pro hac vice*)
Texas Bar No. 11296650
pkennedy@gdhm.com
David A. King (admitted *pro hac vice*)
Texas Bar No. 24083310
dking@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Ave., Suite 2200
Austin, Texas 78701
Telephone: (512) 480-5764
Facsimile: (512) 536-9908

**ATTORNEYS FOR PLAINTIFF**
**TIKD SERVICES LLC**

## CERTIFICATE OF SERVICE

I certify that a true and complete copy of the foregoing was served on counsel below in a manner authorized by the Federal Rules of Civil Procedure on August 15, 2018:

| | |
|---|---|
| Kevin Cox<br>HOLLAND & KNIGHT LLP<br>315 S. Calhoun Street, Ste. 300<br>Tallahassee, FL 32301<br>kevin.cox@hklaw.com | Markenzy Lapointe<br>PILLSBURY WINTHROP SHAW PITTMAN LLP<br>600 Brickell Ave., Ste. 3100<br>Miami, FL 33131<br>markenzy.lapointe@pillsburylaw.com |
| Dominic C. MacKenzie<br>Jerome Wayne Hoffman<br>HOLLAND & KNIGHT LLP<br>50 N. Laura St., Ste. 3900<br>Jacksonville, FL 32202<br>donny.mackenzie@hklaw.com<br>jerome.hoffman@hklaw.com | Gregg D. Thomas<br>James J. McGuire<br>Allison K. Simpson<br>THOMAS & LOCICERO PL<br>601 South Boulevard<br>Tampa, FL 33606-2629<br>gthomas@tlolawfirm.com<br>jmcguire@tlolawfirm.com<br>asimpson@tlolawfirm.com |
| Steven I. Peretz<br>PERETZ CHESAL & HERRMANN PL<br>2 S. Biscayne Blvd., Ste. 3700<br>Miami, FL 33131<br>speretz@pch-iplaw.com | Chris Kleppin<br>GLASSER & KLEPPIN, P.A.<br>9862 W. Broward Blvd., Ste. 105<br>Plantation, FL 33324<br>ckleppin@gkemploymentlaw.com |

*/s/ Peter D. Kennedy*
Peter D. Kennedy