UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-24103-Civ-COOKE/GOODMAN

TIKD SERVICES LLC,

     Plaintiff,

vs.

THE FLORIDA BAR, et al.,

     Defendants.

_____/

**THE FLORIDA BAR DEFENDANTS' MOTION
TO EXCLUDE THE TESTIMONY OF DR. ABRANTES-METZ
AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rules of Evidence 104(a), 401, 402, 403, 702 and 703, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), The Florida Bar ("TFB") and its President and Executive Director as Defendants in their official capacities (collectively the "TFB Defendants") move for an order excluding the testimony of Plaintiff's proposed expert Dr. Rosa Abrantes-Metz, and for an evidentiary *Daubert* hearing on this motion. The methodology that Dr. Abrantes-Metz uses in this case is flawed and her opinions are based on insufficient or incorrect facts or data. For these reasons, her testimony should be excluded.

**MEMORANDUM OF LAW**

## I.  Overview

In *Daubert*, the U.S. Supreme Court required district courts to exclude testimony unlikely to assist the trier of fact through the application of scientific, technical or specialized knowledge. The testimony that Dr. Abrantes-Metz proposes to give in this case concerns the most critical issues in this lawsuit: antitrust violation, causation and injury. But her testimony is the very type that *Daubert* was designed to exclude because it violates *Daubert*'s reliability and relevance requirements. Unless the Court excludes this testimony, it will seriously mislead the jury through the creation of a false aura of scientific infallibility and

misapplication of the law to the facts and would be reversible error.  *See, e.g., Ga. Kaolin Int'l v. M/V Grant Justice*, 644 F. 2d 412, 417 (5th Cir. Unit B May 1981) (district court abused its discretion by permitting expert testimony based on assumptions contrary to facts that materially impacted the outcome of the case);[1] *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (district court abused discretion by permitting speculative expert testimony on earning capacity).

## II.   Factual Background

The Plaintiff hired two experts who have each offered expert reports and been deposed. This motion addresses the proposed testimony of Dr. Abrantes-Metz.  As reflected in her expert report (herein, the "Report," Doc. 215-1) and in her deposition testimony, Dr. Abrantes-Metz purports to offer opinions, *inter alia*, to "address economic issues relating to the relevant antitrust market, alleged coordination, and anti-competitive effects of the alleged conduct."

Paragraph 5 of the Report purports to summarize Dr. Abrantes-Metz's opinions as follows:

- The relevant market with respect to the subject litigation is "access to legal services to defend traffic tickets" in the State of Florida, and competitors within that market include individuals and law firms specializing in defending traffic tickets and intermediaries which match customers to attorneys.

- The Florida Bar is controlled by attorneys who are competitors or potential competitors, many of whom, including attorneys affiliated with The Ticket Clinic, have a financial interest in excluding non-attorneys, like TIKD, from the Relevant Market.

- The Florida Bar has the plenary ability to control the Relevant Market because its membership encompasses 100% of licensed attorneys in the State of Florida— including 100% of licensed attorneys specializing in defending traffic tickets— and because, through its licensing, investigatory, regulatory, and disciplinary functions, including issuing ethics opinions and responding to questions from attorneys calling its Ethics Hotline, it serves as the absolute gatekeeper empowered to bar access to attorneys who wish to serve that market. Through its regulations and disciplinary measures with an effect of excluding providers of access to legal services from the Relevant Market, The Florida Bar has the power to place barriers to entry into and to influence market outcomes in the Relevant Market.

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

- The Ticket Clinic is among the largest players in the Relevant Market with a share of 13.3% of tickets issued, as estimated by Mr. Walter Bratic. Its founder, Mark Gold, has claimed that he "invented" dedicated traffic defense legal practice.

- The alleged concerted and coordinated conduct both by The Florida Bar internally and by The Ticket Clinic and The Florida Bar effectively excluded TIKD from the Relevant Market.

- The alleged concerted and coordinated conduct both by The Florida Bar internally and by The Ticket Clinic and The Florida Bar together reduced competition and induced various anticompetitive effects in the Relevant Market, in the short- and in the long-run. Specifically, in the short-run:

  o Consumers have fewer options available and are worse off due to the loss of innovative and easy options to defend their traffic tickets;

  o Consumers pay more on average per ticket defended, and lose more consumer welfare the more risk adverse they are;

  o Reduction of output in the Relevant Market, if not all TIKD's customers switched to competitors, but instead elected to pay their ticket rather than defending it;

  o Attorneys who represent or represented TIKD customers are worse off due to loss of clients and business, as well as innovative options for acquiring new clients.

- In the long-run, the dynamic efficiencies generated from an innovative competitor such as TIKD are not materialized:

  o Future additional innovation is deterred, which could have assisted with lower future prices and increased future consumer options, enabling expanded future output from both new customers added and from attorneys who would otherwise have continued or become associated with TIKD in the future.

(Report at 4-5.)

There are numerous significant problems with these proposed opinions. First, Dr. Abrantes-Metz's Report indicated she would provide testimony as to how the alleged conduct of the Defendants "reduced competition and induced various anticompetitive effects in the Relevant Market." (Report at 4.) But in fact, she did not provide such testimony and cannot offer any such opinion. At her deposition, she repeatedly stated that she did not have an

opinion as to whether the Defendants' alleged conduct *caused* TIKD's sales and revenues to drop, but only that there was a *correlation* between the alleged conduct and the drop in sales revenues.  (Abrantes-Metz deposition (hereinafter "Dep.") at 54-55, 72-78, and 174-175.)[2]

As Dr. Abrantes-Metz herself noted, "We need to distinguish between correlation and cause."  (Dep. at 75:5-6).  She specifically testified she is "not opining on . . . causation" (*id.* 73:18-23) which she "was not" asked to do (*id.* at 73:13-16), but instead made clear she is simply "looking into a correlation" *(id.* at 74:17-21).  Nor did she attempt to eliminate other possible factors that may have caused TIKD's revenues and sales to drop.  (*Id.* at 57:12-22.)

Second, Dr. Abrantes-Metz has done nothing to independently investigate the facts in this case herself.  (*Id.* at 30:22-31:4.)  She interviewed no witnesses.  (*Id.* at 52:16-20.)  She listed as documents she relied upon selected deposition testimony from TIKD's officers, Chris Riley and Thomas Spahn, but she did not even know who Thomas Spahn was.  (*Id.* at 36:4-37:7.)  She failed to review the testimony of a key witness, Barry Kowitt.  (*Id.* at 47:24-48:9.)  And she failed to review the testimony of any TFB witness.  (*Id.* at 47:18-23.)  She relied upon TIKD's complaint but not TFB's Motion to Dismiss.  (Report at 107.)  She reviewed TIKD's summary judgment responses and statements of fact, but not TFB's Motion for Summary Judgment or TFB's statement of facts.  (Dep. at 46:6-47:17; Report at 107.)

Third, she performed none of the requisite tests to determine the relevant product or geographic market.  She conducted any no competitive pricing analysis of any market.  (Dep. at 16:6-17:14, 190:20-191:8.)  She has done no study of the cross-elasticity of demand for any services in any market.  (*Id.* at 176:11-17.)  She conducted no regression analysis.  (*Id.* at 16:6-17:14.)  She did not conduct a hypothetical monopolist test to determine relevant markets.  (*Id.* at 177:22-178:2).  She did not analyze market share.  (*Id.* at 145:14-146:18).  She has conducted no consumer preference surveys.  (*Id.* at 84:13-21.)

Fourth, she did not provide any opinion that either TFB or TTC had market power.  (*Id.* at 209:16-211:7.)  In fact, she stated unequivocally that TFB did not have market power.  (*Id.* at 210:4-5.)  She testified that she was not asked to determine if TTC had market power.  (*Id.* at 210:9-11.)  Such expert testimony is a prerequisite for any claim under Section 2 of the Sherman Act and Section 542.19, Florida Statutes, and the lack of such opinion is therefore

---

[2] Excerpts of Dr. Abrantes-Metz's deposition are attached as Exhibit A.

4

fatal to Plaintiff's claims. *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 (11th Cir. 1985) ("Construction of a relevant economic market or a showing of monopoly power in that market cannot, however, be based upon lay opinion testimony.").[3]

In short, Dr. Abrantes-Metz reviewed only those materials provided to her by counsel for TIKD and nothing else.  She relied upon no information related to TFB's positions or facts and did not even review the depositions of TFB staff.  (Dep. at 41:23-43:4.)  She conducted no independent investigation of any facts but simply regurgitated the allegations of the Amended Complaint and assumed that they were true.  (*Id.* at 30:16-31:4, 42:11-43:4.)  Nor did she do any statistical, econometric or other analysis of data.  (*Id.* at 175:24-178:2.)  And she reached no opinions on critical issues such as the existence of market power and whether Defendants' alleged conduct, taken as a given, was a material cause of TIKD's drop in sales and revenues.

As shown below, Dr. Abrantes-Metz also has made numerous faulty assumptions in critical areas that are contradicted by the record.  Included among these, Dr. Abrantes-Metz also offers numerous unfounded "opinions" about the legal nature and function of TFB which are misleading and prejudicial, and therefore must be excluded.

For all these reasons, the Court should exclude Dr. Abrantes-Metz's opinions.

## III.   Standard of Review and to Exclude Expert Testimony

Expert testimony can be "'both powerful and quite misleading'" and, therefore, great care must be taken to avoid "dumping a barrage of questionable" evidence on a jury likely to be "awestruck by the expert's mystique."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 595).  A party seeking the admission of expert testimony must establish, by a preponderance of the evidence, a proper foundation for it under Federal Rule of Evidence 702.[4]

---

[3] Notably, Dr. Abrantes-Metz was retained more than eight months after Plaintiff filed its complaint alleging that Defendants had market power in the alleged relevant market.

[4] Rule 702 states:
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> 1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> 2) the testimony is based on sufficient facts or data;
> 3) the testimony is the product of reliable principles and methods; and

In conjunction with Rules 401,[5] 403[6] and 703,[7] Rule 702 imposes a standard of evidentiary reliability that contrasts with the generous approach to admissibility reflected in Rules 401 and 402. *Allison*, 184 F.3d at 1306, 1310; *Daubert*, 509 U.S. at 589-91. As a result, the U.S. Supreme Court imposes a special "gatekeeping" role on the trial court to ensure that all expert scientific testimony, as a condition of admittance, is (1) relevant and (2) reliable. *Allison*, 184 F.3d at 1310 (citing *Daubert*, 509 U.S. at 597); *Phillips v. Am. Honda Motor Co.*, 238 F. App'x 537, 540 (11th Cir. 2007). "The court reviews rulings on the admissibility of expert testimony for abuse of discretion." *Allison*, 184 F.3d at 1306 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997)). "This deferential standard is not relaxed even though a ruling on the admissibility of expert evidence may be outcome-determinative." *Id.*; *see also McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004). Generally, "[c]ourts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles. The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (quoting *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002)).

### A.    Expert Testimony Must Be Reliable

The first "gatekeeping" duty on trial judges imposed by Rule 702 is, "where [expert] testimony's factual basis, data principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592). The court must determine not whether the expert is correct, but whether the proponent of expert testimony has established by a preponderance of the evidence that the testimony is reliable in the context of the

---

4)  the expert has reliably applied the principles and methods to the facts of the case.

[5] Federal Rule of Evidence 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action."

[6] Federal Rule of Evidence 403 states, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

[7] In connection with expert testimony, a court must "be mindful of" Federal Rules of Evidence 703 and 403, in addition to Rule 702. *Daubert*, 509 U.S. at 595. Under Rule 703, expert opinions may be based on hearsay only if the "facts or data" relied upon are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. *See Allison*, 184 F. 3d at 1312.

methodologies or techniques applied with the appropriate field. *See Allison*, 184 F.3d at 1312; *accord Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999). Reliability is as much a factor for economists as for any other experts. *See In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1248 (E.D.N.Y. 1985) (citing *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C. Cir. 1977)), *aff'd*, 818 F. 2d 187 (2d Cir. 1987), *cert. denied*, 487 U.S. 1234 (1988).

The inquiry required by Rule 702 is flexible, but requires the Court at least to assess the following factors to evaluate the reliability of an expert's proposed testimony: 1) whether the expert's methodology has been tested or is capable of being tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential rate of error of the theory or technique; and, 4) whether the technique has been generally accepted in the proper scientific community. *Allison*, 184 F.3d at 1312; *Phillips*, 238 F. App'x at 540 (excluding expert testimony where there was no reliable link between the expert's data and the facts in the case); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 n.16 (11th Cir. 1998).

B.    **Expert Testimony Must Be Relevant and "Fit" the Facts**

The second "gatekeeping" duty imposed by *Daubert* on trial judges is to "ensure that the proposed expert testimony is 'relevant to the task at hand,' . . . *i.e.*, that it logically advances a material aspect of the proposing party's case." *Allison*, 184 F.3d at 1312. "Significantly, the expert's testimony must be helpful to, or 'fit' with, the factual issues to be resolved—*i.e.*, the district just must determine whether the expert's reasoning and methodology can be properly applied to the facts." *Johnson v. Louisville Ladder*, No. 07-764-KD-M, 2008 WL 5122261, at *8 & n.4 (S.D. Ala. Nov. 14, 2008); *see also id.* ("Where the opinion does not advance the question in dispute for which the opinion is proffered, then there is no 'fit' and the opinion should be excluded."); *McDowell*, 392 F.3d at 1299 ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions . . . ."). "[W]here an expert's testimony fails to meet the 'fit' requirement (because the data or facts relied upon are materially different from the data or facts of the case), the inquiry ends because the testimony is due to be excluded." *Johnson*, 2008 WL 5122261, at *11.

IV.   Argument

A.   Dr. Abrantes-Metz's Testimony Is Not Reliable

Dr. Abrantes-Metz's testimony fails to satisfy any prong of the four-part test of reliability in this Circuit and should therefore be excluded.  *Allison*, 184 F.3d at 1309.

1.   *The Expert's Theory of Liability Has Not Been Tested*

"The first and most significant *Daubert* factor is whether the scientific theory has been subjected to the scientific method." *Bushore v. Dow Corning-Wright Corp.*, No. 92-344-CIV-T-26C, 1999 WL 1116920, at *3 (M.D. Fla. Nov. 15, 1999) (internal quotation marks omitted) (excluding expert testimony on causation); *accord Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1163 (S.D. Fla. 1996) (ruling untested expert testimony inadmissible), *aff'd*, 158 F.3d 588 (11th Cir. 1998).  As one district court noted, "[e]xperts cannot float their conclusions on cushions of air; they must rest those conclusions upon foundations built from reliable scientific explanation." *Navarro v. Fuji Heavy Indus., Ltd.*, 925 F. Supp. 1323, 1328 (N.D. Ill. 1996), *aff'd*, 117 F.3d 1027 (7th Cir. 1997), *cert. denied*, 522 U.S. 1015 (1997).  In antitrust cases, an economist's proposed testimony about the relevant market, anticompetitive conduct and damages based on an unreliable methodology should be excluded. *Ky. Speedway v. Nat'l Ass'n of Stock Car Racing*, 588 F.3d 908, 918 (6th Cir. 2009) (excluding economist's testimony about market and anticompetitive conduct premised upon utilizing methodology in an untested manner); *Corey Airport Servs., Inc. v. City of Atlanta*, 632 F. Supp. 2d 1246, 1299 (N.D. Ga. 2008), *rev'd in part on other grounds*, 587 F. 3d 1280 (11th Cir. 2009) (excluding testimony, in part, because economist assumed antitrust violation before defining relevant market).[8]  Dr. Abrantes-Metz's testimony is flawed in each of these respects.

---

[8] *Accord Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2016) (affirming as inadmissible economist's report lacking empirical support and ignoring testimony); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) (affirming as inadmissible expert report on monopoly power based on data unreliability); *Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 3289076, at *4 (E.D. Wis. June 28, 2013) (excluding economist's testimony on damages lacking independent analysis); *Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08 C 3977, 2011 WL 382743, at *2 (N.D. Ill. Feb. 3, 2011) (excluding accountant's testimony on damages based on internal projections, insufficient comparators, and failure to consider alternatives); *ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 667-68 (D. Del. 2009) (excluding economist's opinion on damages resting on "the slenderest of analytical threads . . . whose source is . . . untested" (internal footnote omitted)).

a.    *Dr. Abrantes-Metz Has Not Performed Any Test Corroborating the Chosen Relevant Markets*

Dr. Abrantes-Metz states that her first task was to define the relevant market.  (Report at 4.)  This "requires identification of both the product at issue and the geographic market for that product."  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002).  In this respect, the extent to which an expert may rely upon the allegations in the Complaint is narrowly limited:

> The proper procedure would be to assume that the allegations in the complaint are true, use those allegations to determine what studies and analyses are required in order to define the relevant market, conduct the requisite research and define the relevant market, and then determine whether there has been harm in that market such that there is a violation of the antitrust laws. Thus, in this case, Landon should have first assumed that the factual allegations contained in the complaint are true and then used those allegations as a starting point for defining the relevant market. Even taking the factual allegations in the complaint as true, it might turn out that the relevant market is such that there has been no antitrust violation. But by assuming that the allegations are true and constitute an antitrust violation, the expert is forced to define the relevant market such that a violation has occurred.

*Corey*, 632 F. Supp. 2d at 1291.  In this case, there is no such evidence.  The product market Dr. Abrantes-Metz defined—providing "access to legal service to defend traffic tickets"—is just a legal conclusion drawn artificially by the Plaintiff in the Amended Complaint and unsupported by scientific method.

i.    *The Product Market Definition Is Untested*

An expert may not testify where his testimony rests on assumptions wholly without foundation in the record.  *See Boucher*, 73 F.3d at 21-23 (holding that expert testimony should have been excluded when it was based on conjecture and faulty assumptions); *Ga. Kaolin Int'l*, 644 F.2d at 417 (stating that if "the opinion evidence was based on assumptions . . . which were incorrect as not being supported in the record or as contrary to the proof in the record and which incorrect assumptions would substantially affect the validity of the opinion evidence, then such evidence should not have been accepted by the trial court").  Moreover, "[w]hen an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded."  *King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685, at *2 (S.D. Ind. Sep. 29, 2009).

Dr. Abrantes-Metz testified that on other occasions where she has done a formal antitrust analysis of the relevant market, she has performed a regression analysis "many times." (Dep. 16:6-12.) In this case, however, she did not do a regression analysis because it required pricing data which she asked TIKD to obtain in discovery, but which was never provided to her. (Dep. 16:6-17:14.) Similarly, Dr. Abrantes-Metz failed to undertake the most basic test or other analyses of the cross-elasticity of demand within the markets to determine whether the product market she proposes is supported by the facts. (Dep. 176:11-14.) The failure to conduct such tests is a departure from standard professional practice. *See Corey*, 632 F. Supp. 2d at 1291-92 (stating that the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand); *Ky. Speedway*, 588 F.3d at 917 (similar). Like other kinds of expert testimony, testimony regarding the relevant market for purposes of establishing an antitrust violation may be excluded if not based on evidence in the record. *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. at 1248 (excluding testimony of economist assuming the geographic scope of the market without record support); *see also Pa. Dental Ass'n v. Med. Serv. Ass'n*, 745 F.2d 248, 261-62 n.7 (3d Cir. 1984).

### ii.    *The Geographic Market Definition Is Untested*

Dr. Abrantes-Metz accepted the same geographic market described in the Complaint: the entire state of Florida. But she did no scientific analysis of the data to determine whether there are smaller geographic markets at the regional or county level. (Dep. at 200:3-22.)

Dr. Abrantes-Metz's testimony shows that her proposed relevant geographic market is inconsistent with the facts and is contradicted by the testimony of Mr. Riley and TIKD's other expert on damages, Walter Bratic. For instance, many of the law firms and non-law firms Dr. Abrantes-Metz lists as competitors in her Report only serve some of the counties in Florida. When defining the relevant geographic market, Dr. Abrantes-Metz also includes at least four firms in her list of competitors that she indicates are not law firms and do not do serve Florida. (Report ¶ 26.) Dr. Abrantes-Metz was unaware about whether the firms which she identified as competitors in the alleged relevant market offer services in select Florida counties or nationally. (Dep. at 187:20-188:22.) In addition, she was unaware whether TIKD provided service during the alleged period in all counties in Florida, or in just select counties.

(Dep. at 187:10-15.)  In actuality, TIKD operated in at most 18 of Florida's 67 counties, and in only four counties at the outset of this lawsuit.[9]

Dr. Abrantes-Metz offers no rigorous analysis to conclude that the geographic market for "access to legal services to defend traffic tickets" is statewide.  She has no data to support her conclusion.  Again, she admitted that she did not perform any price sensitivity analysis as is required.  (Dep. at 175:24-178:2); *see Ky. Speedway*, 588 F.3d at 918 (excluding expert testimony using untested modified version of Small but Significant Non-transitory Increase in Price test); *Corey*, 632 F. Supp. 2d at 1298 (stating that measurement of the relevant geographic market for purposes of an antitrust claim depends on, *inter alia*, price data).  Nor did she do any consumer research.  (Dep. at 57:23-58:4.)  In fact she ignored data that show that prices for legal services and TIKD's own prices varied by county, which is reflected in Figure 9 of her own Report.  (Report at 60-61.)

In short, Dr. Abrantes-Metz's proposed testimony concerning the relevant geographic market should be excluded.  It is unsupported by any reliable data or sound methodology, and is purely the product of her own "ipse dixit" analysis.

### iii. Dr. Abrantes-Metz Has No Opinion on Market Power in the Relevant Market

Even if Dr. Abrantes-Metz had properly determined and corroborated the product and geographic markets for which she intends to offer testimony, Dr. Abrantes-Metz concedes that TFB does not have market power and that she was not even asked to determine if TTC had market power.  Dr. Abrantes-Metz's testimony therefore simply cannot be the foundation of any claim under Section 2 of the Sherman Act or Section 542.19, Florida Statutes based on the exercise of market power.

In using a method of analysis that, although typical within an economist's field, "is not typically used to make statements regarding causation without considering all independent variables that could affect the conclusion," Dr. Abrantes-Metz's testimony fails to comply with this prong of the *Daubert* test.  *Blue Dane Simmental v. Am. Simmental Ass'n*, 178 F. 3d 1035, 1040-41 (8th Cir. 1999).  There must be some reliable factual basis upon which the opinions of an expert is premised.  *See Smith v. Ortho Pharm. Corp.*, 770 F. Supp. 1561, 1573

---

[9] Declaration of Christopher Riley, Doc. 12-2 at p. 5, ¶23.

(N.D. Ga. 1991). Again, "[w]hen an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded." *King-Ind.*, 2009 WL 3187685, at *2; *accord Am. Key Corp.*, 762 F.2d at 1580 (criticizing the expert for merely "spot check[ing]" and doing "nothing to verify the 'facts' submitted to him").

These material factual errors are a function of Dr. Abrantes-Metz's failure to conduct an independent investigation as is the standard for experts. Repeatedly, Dr. Abrantes-Metz testified that she took for granted the facts as presented by the Plaintiff in the Complaint without conducting any investigation that could influence her opinion. (Dep. at 30:13-20.) She did not read the deposition testimony of any of the TFB witnesses. (*Id.* at 47:18-23.) Dr. Abrantes-Metz's "head in the sand" approach suggests she has become an advocate for a cause, instead of analyzing the issue from an objective standpoint. *See Viterbo v. Dow Chem. Co.*, 646 F. Supp. 1420, 1425 (E.D. Tex. 1986), *aff'd*, 826 F. 2d 420 (5th Cir. 1987) (excluding expert testimony without published foundation based on attribution of causation where other experts agreed other causes were at work). By comparison, the law is settled that "when an expert relies upon information given to him by a party or counsel, he must independently verify that information before utilizing it in his calculations." *King-Ind.*, 2009 WL 3187685, at *2. The bottom line is that Dr. Abrantes-Metz's testimony is unreliable and, thus, should be excluded.

> b.    *Dr. Abrantes-Metz's Proposed Testimony about Antitrust Injury Is Untested and Is Contradicted by the Record Evidence*

Establishing a substantial likelihood of suffering antitrust injury is a second overarching prerequisite to cases brought under the Sherman Act.[10] "Antitrust injury" must be interpreted narrowly, so Plaintiff's burden is a heavy one; "speculative statements about anticompetitive effects will not satisfy the narrow standard for establishing antitrust injury." *HTI Health*, 960 F. Supp. at 1111.

---

[10] *HTI Health Servs., Inc. v. Quorum Health Grp., Inc.*, 960 F. Supp. 1104, 1111 (S.D. Miss. 1997); *see also T.O. Bell v. Dow Chem. Co.*, 847 F. 2d 1179, 1182 & n.4 (5th Cir. 1988) ("Proving antitrust injury is a necessary requirement for proving standing; the former cannot stand alone from the latter."); *Phototron Corp. v. Eastman Kodak Co.*, 842 F. 2d 95, 98-99 (5th Cir. 1988) ("[W]e must, at the least, remand the case for a determination whether there is a substantial likelihood that Phototron will be able to prove antitrust injury at trial." (construing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986))).

As already shown, causation is among the foremost weaknesses in Dr. Abrantes-Metz's proposed testimony.  Dr. Abrantes-Metz's failure to establish a causal link, and to consider alternative potential causes for the harms, requires exclusion of her proposed testimony.[11]  If TIKD has suffered any "injury" in the form of lost revenues, it was likely the result of its changes to its business model and its decision to cut its advertising and marketing expenses, not TFB's conduct.  Dr. Abrantes-Metz's factual assumptions about correlation were wrong.  As such, her opinion as to any correlation between the Defendants' alleged conduct and TIKD's lost revenues is faulty.

The absence of any reliable link between the experts' opinions and the facts of a case also requires exclusion of the experts' testimony.  *Phillips*, 238 F. App'x at 540; *McDowell*, 392 F.3d at 1301.  Because of the failure to show a causal connection between the alleged anticompetitive conduct and the "injury-in-fact" to TIKD, Dr. Abrantes-Metz's testimony should be excluded.

Beyond causation, several other of Dr. Abrantes-Metz's methodological assumptions are unreliable.  For instance, Dr. Abrantes-Metz does not account for the differences in the mix of tickets served by TIKD and TTC, since TIKD admitted that it rejects a certain portion of violations for various reasons.  (Riley June 21 Tr., Doc. 193-3 at 164:3-22; Report at 8-19.) She wrongly assumes that the quality of services at TIKD and TTC are the same.  (Dep. at 241:9-242:19.)  Dr. Abrantes-Metz does not take into account the increased automobile insurance premiums that consumers would likely experience in cases where consumers get assessed points on their driving records.  She fails to acknowledge that a percentage of customers whose tickets are dismissed are better off hiring a traffic ticket defense law firm or defending the ticket themselves, rather than using TIKD.  She did not look at variations in the dismissal rates across counties.  (Dep. 203:12-204:6.)

---

[11] *See Smith*, 770 F. Supp. at 1581 ("The conclusions Doctors Bussey and Holbrook reach are also insufficient as a basis for a finding of causality because they fail to consider critical information, such as the most relevant epidemiologic studies and the other possible causes of disease."); *Bushore*, 1999 WL 1116920, at *7; *Haggerty*, 950 F. Supp. at 1167 ("Dr. Mash's causation opinion is based on speculation, and the absence of scientific principles in her methodology deprives her opinion of the reliability necessary for admission in evidence."); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. at 1249 ("Courts are particularly wary of unfounded expert opinion when causation is the issue." (collecting citations)); *Viterbo*, 646 F. Supp. at 1425 (excluding expert opinion testimony where tests failed to establish a causal link but did show other variables that could account for the injuries).

Dr. Abrantes-Metz's reliance on assumptions that are unsupported or in some cases contradicted by record evidence requires that her testimony be excluded. *United States v. City of Miami, Fla.*, 115 F.3d 870, 873-74 (11th Cir. 1997) ("Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion. Opinions derived from erroneous data are appropriately excluded." (citations omitted)); *Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir. 1993) (holding that a district court did not err by excluding an expert's testimony that "was based on assumptions that were not supported by the record"); *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) (holding that expert testimony could not create a triable issue of fact where the expert's "facts" were "based entirely on [a party's] inadmissible lay testimony" and the expert "did nothing to verify the 'facts' submitted to him" because "[e]xpert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not" (citations omitted)); *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 789 (11th Cir. 1983) ("[E]xpert testimony [is] inadmissible where [the expert's] basic assumption as to market share plaintiff would have garnered is completely unsupported." (citing *Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 911–13 (2d Cir. 1962))).

2.    *The Expert's Theory of Liability Has Not Been Subject to Peer Review.*

"The fact of publication (or lack thereof) in a peer reviewed journal will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Daubert*, 509 U.S. at 594. "Peer review is significant under *Daubert* because 'scrutiny of the scientific community is a component of good science, in part, because it increases the likelihood that substantive flaws in methodology will be detected.'" *Allison*, 184 F.3d at 1313 (quoting *Daubert*, 509 U.S. at 593). Under this prong of the reliability test, the Eleventh Circuit has "warn[ed] against leaping from an accepted scientific premise to an unsupported one." *Id.* at 1314 (collecting citations). This "leaping" or "extrapolation" problem amounts to substituting personal opinion for scientific knowledge. *Id.* at 1319.

Unjustified extrapolation suffuses proposed testimony in especially suspect circumstances where an alternative methodology points to a different conclusion. *Id.* at 1314.

14

The extrapolation problem inherent in Dr. Abrantes-Metz's proposed testimony has been discussed in the previous section.

> 3.      *The Potential Rate of Error of the Expert's Theory Is Uncertain*

The third prong of *Daubert* requires the court to "consider the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." *Bushore*, 1999 WL 1116920, at *4. Here, Dr. Abrantes-Metz did no regression analysis or any other econometric or statistical analysis of any data whatsoever. Obviously, there is no known or acceptable rate of error in the *absence* of any testing at all. *See Haggerty*, 950 F. Supp. at 1164. For the reasons explained above, there are also substantial "non-causation related biases which affect" the expert's reported conclusions. *Id.* Consequently, the proposed testimony also fails this prong of the test.

> 4.      *Dr. Abrantes-Metz's Testimony as to Liability Is Not Generally Accepted*

"Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." *Bushore*, 1999 WL 1116920, at *5 (citing *Daubert*, 509 U.S. at 594). Any deviation from generally accepted methodology must be grounded in "demonstrable and scrupulous adherence to the scientist's creed of meticulous and objective inquiry." *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 n.4 (5th Cir. 1996) (internal quotation marks omitted). This prong of the test enables the district court to weigh the relative findings of studies to evaluate whether particular conclusions are "out of sync with the conclusions in the overwhelming majority of" other studies. *Allison*, 184 F.3d at 1315-16. Dr. Abrantes-Metz's testimony fails this test.

As noted above, Dr. Abrantes-Metz opines that there is a "correlation" between events and a decline in revenues, but concedes that there is a difference between correlation and causation. TIKD offers this "correlation" as evidence that it has been injured, without giving any consideration to any other causation factors, including most notably the undisputed fact that TIKD admittedly decreased its advertising spending in order to launch and pursue this federal litigation and due to the "cost" of such advertising. (Spahn Tr. 193-2 at 143:16-18, 154:3-21.)

Nowhere does Dr. Abrantes-Metz consider this decrease in advertising and change in the business model as a potential cause of TIKD's alleged decrease in revenue. To the contrary, Dr. Abrantes-Metz's opinions are the product of her blind acceptance of one-sided allegations and assumptions which are contradicted by undisputed facts.

### B.    Dr. Abrantes-Metz's Opinions Are Totally Unsupported Factually

"Expert testimony is excludable when the factual basis are unsupported and the testimony will not assist the jury." *Johnson*, 2008 WL 5122261, at *8; *see also Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

First, Dr. Abrantes-Metz admits that in many instances the "event' or conduct by Defendants to which she points as "correlating" with drops in TIKD's revenues and sales do not actually correlate. (Dep. at 64:7-65:15.) Moreover, the timing of some of the events to which she points is wrong in her report. For example, she cited a CBS article, which she said was dated April 28, 2017, as an event which caused a decrease in TIKD's revenues on that date, but the article was actually published 10 days earlier, on April 18, 2017, and in any event TIKD's revenues also increased right afterward. (Report at 51.)[12] She cited the August 29, 2017 date of a written staff opinion issued by TFB as an event which decreased TIKD's revenues on that date, but that Staff Opinion was not shared with anyone but the requester until October 3, 2017, and even then there is no evidence that it was shared with consumers at any time. (Dep. 120:11-121:12.)[13] Thus, Dr. Abrantes-Metz's proposed testimony about the effect of Defendants' alleged conduct on TIKD's sales and revenues—the core issue in this case—is purely speculative and should not be allowed to confuse the jury. *Boucher*, 73 F. 3d at 22.

Second, Dr. Abrantes-Metz was largely unfamiliar with the facts of the case. Dr. Abrantes-Metz indicated that she relied on the testimony of Thomas Spahn, but did not know who he was. (Dep. at 36:4-12.) Mr. Spahn was one of only two persons from TIKD who was deposed; he is TIKD President and Chief Operating Officer. (Spahn Tr., Doc. 193-2 at 8:25-9:2.) Dr. Abrantes-Metz did not know that there were contracts between a TIKD affiliate

---

[12] Compare https://miami.cbslocal.com/2017/04/18/traffic-ticket-app-tikd-ticket-clinic-battle/ (dated Apr. 18, 2018).
[13] Kowitt, Tr. Doc. 193-7 at 68:3-69:15.

and attorneys which it uses to provide services for TIKD customers (Dep. at 121:18-123:10), although there are such contracts. (Spahn Tr., Doc. 193-2 at 179:17-25; Riley Tr., Doc. 193-3 at 172:4-16.) She did not know that TIKD did not do business in all Florida counties. (Dep. 186:23-187:19.) She was unaware that TIKD decrease its advertising spending in the middle of 2017, other than that advertising spending "fluctuated." (Dep. 65:18-66:17.)

Third, Dr. Abrantes-Metz proposes to testify that Defendants' conduct in excluding TIKD from the market will cause higher prices for consumers for traffic ticket defense services. (Report at 61.) But Dr. Abrantes-Metz admits that she has not studied any actual prices of TTC or any of the other competitors in the market. (Dep. 174:24-178:2.) She also only compared TIKD's prices with TTC and not any of the twenty-plus competitors she listed in her report. Furthermore, she made a "simplifying assumption" that the dismissal rates for all competitors including TIKD were the same and that the percentage of cases where the consumer received points was the same for all competitors. (Dep. 235:24-236:13.) Yet, there is no evidence to support such an assumption. In fact, there is evidence to the contrary and is inconsistent with TIKD's own damages expert. (Dep. 243:17-254:5.)

Finally, Dr. Abrantes-Metz's conclusions about the impact of TIKD's exclusion from the market on consumer benefit from technological innovation are speculative at best and are unsupported by the facts. Dr. Abrantes-Metz asserts that, after an increasing number of attorneys left TIKD, "[c]onsumers were made worse off due to the loss of innovative and easy options to defend their traffic tickets." (Report at 57.) She presents a Table (Figure 8) with a list of "service choices" that consumers can access through TIKD when attempting to defend a $200 traffic ticket in Florida, and compares select features of TIKD with only three other competitors to conclude that "[d]ue to the exclusion of TIKD from the Relevant Market, consumers would have had fewer choices of innovative tools for defending their tickets." (Report at 58.) However, Dr. Abrantes-Metz fails to show that consumers would be denied access to the "innovative" features offered by TIKD since her "analysis" does not consider more than 20 other purported competitors in the Florida marketplace she herself lists (Report at 11-19), much less other potential competitors. Nor does Dr. Abrantes-Metz perform any analysis indicating whether customers placed any value on the purported "innovative" features offered by TIKD or, if so, whether that value was economically material to their decision to use TIKD to resolve their traffic violation. For instance, if customers used TIKD

primarily for other reasons (for example, because TIKD's services were advertised at a Marlins baseball game), and were generally unaware of, or did not use, the features that Dr. Abrantes-Metz describes as "innovative," then most or many customers are not worse off in the marketplace if they do not have access to TIKD as an option to resolve their traffic tickets. For the features that some customers may have valued, Dr. Abrantes-Metz did not perform an adequate analysis to determine whether acceptable substitutes in the eyes of consumers exist. Rather than using TIKD's BetterPay, customers who may value that feature can access such a service through their own credit card.[14]   Moreover, Dr. Abrantes-Metz's does not consider that some competitors offer potentially valued product attributes that TIKD does not offer, such as their services via a true mobile application rather than TIKD's web-based app (Dep. 265:7-17), free consultations, or attorney profiles.

### C.   Dr. Abrantes-Metz Proposes to Provide Legal Conclusions that Are Erroneous

Dr. Abrantes-Metz's Report also includes a variety of legal conclusions, which invade the province of the Court and are therefore inadmissible.   More problematically, these conclusions are erroneous.   For instance, Dr. Abrantes-Metz opines, among other things, that

- TFB "through its licensing, investigatory, regulatory, and disciplinary functions, including issuing ethics opinions and responding to questions from attorneys calling its Ethics Hotline, serves as the absolute gatekeeper empowered to bar access to attorneys who wish to serve the market" (Report at 5; *see also id.* at 29);

- TFB, "[t]hrough its regulations and disciplinary measures with an effect of excluding providers of access to legal services from the Relevant Market, [TFB]

---

[14] See "Civil Infraction Tickets," Harvey Ruvin Clerk of the Courts, Miami-Dade County, Florida, at http://www.miami-dadeclerk.com/traffic_civil_infraction.asp.

has the power to place barriers to entry into and to influence market outcomes in the relevant market" (*id.*);

- TFB "sets the rules" and "whoever does not follow the rules set by The Florida Bar … cannot practice law" (Dep. 114:8-11); and

- TFB has the power to disbar attorneys for working with TIKD (Dep. 132:21-133:7).

This is a complete misstatement of the law which Plaintiff will attempt to provide to the jury under the cloak of an expert. The Florida Supreme Court acts as the absolute gatekeeper to attorneys who wish to practice in Florida; the Florida Supreme Court admits attorneys who have satisfied the application requirements administered by The Florida Supreme Court's arm, the Board of Bar Examiners; and although TFB has duties under the Rules Regulating the Florida Bar, these are promulgated by The Florida Supreme Court, and any discipline or ruling on UPL is reserved for the ultimate and final authority of the Florida Supreme Court. Dr. Abrantes-Metz has no understanding of this. (Dep. 109:23-119:17, 131:25-133:7.)

Dr. Abrantes-Metz's opinion, however, is that TFB essentially performs all of the functions of the Florida Supreme Court and the Board of Bar Examiners, which completely contradicts the law and would be highly prejudicial and misleading to a jury. *See, e.g., Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("the court must be the jury's only source of law"); *In re Rosenberg*, No. 09–13196–BKC–AJC, 2012 WL 3870351, at *2 (Bankr. S.D. Fla. 2012) ("[I]nstructing the jury on legal matters is the exclusive domain of the judge. . . . [A]n expert witness is prohibited from rendering a legal opinion because doing so would usurp the court's role and possibly confuse the jury. The Court believes that the District Court is capable of explaining the applicable law to the jury.").

## V.   Conclusion

Dr. Abrantes-Metz's proposed testimony on key elements of TIKD's case is neither reliable nor consistent with the record evidence. Moreover, her approach is unscientific, unsupported by any econometric or statistical analysis of the facts, and relies on assumptions not only unsupported by the facts but contrary to the facts. It quite simply appears to be product of advocacy and not scientific inquiry. The Supreme Court has instructed district courts to exclude expert witness testimony of this nature and this Court should do so for the reasons stated above.

## REQUEST FOR EVIDENTIARY HEARING

Defendants respectfully request that the Court set this matter for an evidentiary *Daubert* hearing not to exceed four hours. *See City of Tuscaloosa*, 158 F.3d at 564 n.21 ("While *Daubert* hearings are not required by law or by rules of procedure, they are almost always fruitful uses of the court's time and resources in complicated cases involving multiple expert witnesses, such as the instant case."); *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1089 (10th Cir. 2000) (remanding case for new trial finding that district court had not fulfilled its "gatekeeping function" in failing to hold a *Daubert* hearing upon plaintiff's request).

## GOOD FAITH CERTIFICATION

The undersigned counsel certifies that he has contacted opposing counsel in a good-faith effort to resolve the disputed issues presented herein and that opposing counsel does not agree to the relief requested.

Respectfully submitted this 28th day of September, 2018.

**HOLLAND & KNIGHT LLP**

/s/ *Kevin W. Cox*
Kevin W. Cox (FBN 34020)
kevin.cox@hklaw.com
shannon.veasey@hklaw.com
315 S. Calhoun Street
Tallahassee, Florida 32309
Telephone: (850) 425-5624
Facsimile: (850) 224-8832

Jerome W. Hoffman (FBN 0258830)
jerome.hoffman@hklaw.com
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
Telephone: (904) 353-2000
Facsimile: (904) 358-1872

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Markenzy Lapointe (FBN 172601)
markenzy.lapointe@pillsburylaw.com
janel.diamond@pillsburylaw.com
600 Brickell Ave Ste 3100
Miami, FL 33131-3089

Telephone: (786) 913-4805
Facsimile: (786) 924-8210

*Counsel for Bar Defendants*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic service on September 28, 2018 to:

Robert J. Kuntz, Jr., Esq.
DEVINE GOODMAN RASCO &
WATTS-FITZGERALD, LLP
2800 Ponce de Leon Blvd., Suite 1400
Coral Gables, Florida 33134
rkuntz@devinegoodman.com

Peter D. Kennedy
David A. King
GRAVES, DOUGHERTY, HEARON
& MOODY, P.C.
401 Congress Ave., Suite 2200
Austin, Texas 78701
pkennedy@gdhm.com
dking@gdhm.com

*Counsel for TIKD Services, LLC*

/s/  Kevin W. Cox
Attorney

#60981747_v2